William G. Walker, Esq.
WILLIAM G. WALKER, P.C.
177 N. Church Avenue, Suite 700
Tucson, AZ 85701
Telephone: (520) 622-3330
PCCN: 60292
SBN: 005361
wgwpc@aol.com

**Attorney for** Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| RONALD COOKE AND JINJER COOKE, husband and wife, | |
| Plaintiffs, | No: |
| vs. | |
| TOWN OF COLORADO CITY, ARIZONA; CITY OF HILDALE, UTAH; HILDALE-COLORADO CITY UTILITIES (Hildale-Colorado City Power, Water, Sewer and Gas Department and Twin City Water Authority); TWIN CITY POWER; JOHN AND/OR JANE DOES I-XX; XYZ ENTITIES/CORPORATIONS I-XX, | COMPLAINT |
| Defendants. | (JURY TRIAL DEMANDED) |

Plaintiffs allege:

## INTRODUCTION

This case is a civil rights action which is brought by Plaintiffs pursuant to 42 U.S.C. §§ 1983 and 1985 and the Federal and State Fair Housing Acts, 42 U.S.C. §§ 3601, *et seq.*, and A.R.S. §§ 41-1491, *et seq.* Its purpose is to remedy Defendants' discriminatory and unlawful housing practices and to compensate the Plaintiffs for their damages and injuries arising therefrom.

## JURISDICTION AND VENUE

This Court has jurisdiction of this matter pursuant to 42 U.S.C. § 3613(a) and 28

U.S.C. §§ 1331, 1343(a)(4), and 1367(a).

## PARTIES

1. Plaintiffs Ronald Cooke and Jinjer Cooke, are, and were at all times relevant hereto, husband and wife.

2. On or about May 21, 2008, the Cookes and their children moved their residence to 400 East Academy Drive, Colorado City, Arizona, and have legally resided there throughout the time of the filing of this Complaint.

3. Plaintiff Ronald Cooke is, and has been at all times relevant hereto, permanently and severely mentally and physically disabled as the result of having been struck by a truck in the area of Phoenix, Arizona, in 2005.

4. Defendant Town of Colorado City ("CC") is a municipality in the State of Arizona.

5. Defendant City of Hildale ("Hildale") is a municipality in the State of Utah.

6. Defendant Twin Cities Water Authority ("TCWA") is a Utah non-profit corporation;

7. Defendant Twin Cities Power ("TCP") is an intergovernmental entity formed by Defendants CC and Hildale which, during relevant times at issue, provided electric utility service for CC and Hildale residents and participated in the HCC Utilities and the Utility Board until approximately July 2009, when Garkane Energy took over responsibility for providing electric utility service in that area.

8. Defendant Hildale-Colorado City Utilities ("HCC Utilities") is an inter-governmental utility entity formed by Defendants CC and Hildale. Upon information and belief, HCC Utilities administers and provides water, sewer and gas utilities to residents of CC and Hildale, and consists of the Hildale-Colorado City Power, Water, Sewer and Gas Department and Defendant TCWA. Upon information and belief, the Utility Board makes policy recommendations to and follows utility-related solutions and ordinances adopted by

2

Defendants CC and Hildale.

9. John and/or Jane Does I-XX are individuals, and their community partners, who are yet unnamed, and engaged in acts in derogation of Plaintiffs' Constitutional, statutory and/or property rights by acting alone, under color of state law, or in concert with other Defendants or third parties, committing acts as principles, co-conspirators and/or aiders and abetters.

## GENERAL ALLEGATIONS

10. Plaintiff Ronald Cooke ("RC") was born in the area of Colorado City/Hildale, and was raised in the Fundamentalist Church of Jesus Christ of Latter Day Saints ("FLDS") religion. He left the FLDS religion at age 18 or 19 and moved to Phoenix, Arizona, to work in construction.

11. He is, and was at all times relevant hereto, permanently and severely disabled as the result of having been hit by a large truck while performing road construction in the Phoenix area. As a result of the accident, he has suffered traumatic brain and spinal cord injury, facial paralysis and multiple physical and mental impairments which substantially and permanently limit him in performing multiple major activities of daily living including walking and balancing, memory and cognition, bladder and bowel function and breathing. Due to his disabilities, RC needs running water to clean catheters, bathe frequently, avoid infection and wash laundry. He also requires reliable electricity to run an electronic medical device which assists him with breathing when he sleeps.

12. Plaintiffs Jinjer Cooke ("JC") is not, and has never been, a member of the FLDS religion.

13. At all times relevant hereto, Defendants, and each of them, have been operated and controlled by members of the FLDS religion, a polygamist sect, which seeks to exclude non-members of FLDS from the communities of Colorado City, Arizona, and Hildale, Utah, professing that such non-members are apostates and tools of the devil.

14. Plaintiffs, upon information and belief, allow FLDS, and members thereof, to

3

influence, misuse and affect the availability of utility services to residents of Colorado City and Hildale as a method of preserving religious domination over residents of Colorado City and Hildale.

15. Upon information and belief, Defendants and their agents, in order to support the religious doctrines and aims of FLDS, have denied non-members of FLDS utility services and co-mingled governmental funds with church funds, thereby depleting revenues which should be legitimately used to provide utility services at the expense of residents of Colorado City and Hildale such as Plaintiffs.

16. On information and belief, Defendants, and their agents, have treated the governmental agencies that they control as arms of the FLDS religion, and utilized the powers and resources of these municipal entities to attempt to exclude non-members of FLDS, such as Plaintiffs, from the communities of Colorado City and Hildale.

17. In late 2007, because of his desire to live near friends and family in Colorado City, RC and his family applied to the United Effort Plan ("UEP") for suitable, affordable housing for himself, his wife Jinjer and their three children.   RC was determined to qualified for such housing as a beneficiary/trust participant because of contributions he had made in cash and in kind to UEP and properties owned by it.

18. In late 2007/early 2008, Plaintiffs looked at numerous vacant UEP properties in Colorado City with a general contractor and a member of the UEP Housing Advisory Board.

19. At that time, the only suitable property that met RC's disability needs and was large enough for his family was an unfinished home at 400 or 420 East Academy Avenue in Colorado City ("the subject property").

20. On or about February 11, 2008, RC entered into an Occupancy Agreement for the subject property with UEP, the owner of the property.

21. At the time RC entered into the Occupancy Agreement, Plaintiffs planned to move to Colorado City after the children finished school in May, and live in their small

4

1  travel trailer for no more than a month while the general contractor completed construction
2  and utilities were hooked up for the home.
3       22.   On or about May 21, 2008, Plaintiffs moved their residence and belongings to
4  the subject property.
5       23.   On or about May 27, 2008, Plaintiffs requested sewer, electric and water
6  services from Defendants for the subject property. At the time of theses requests, Plaintiffs
7  were told by Defendant CC that the subject property had been abandoned in 2001 by Robert
8  Black, and that therefore new construction permits and inspections would be required before
9  Plaintiffs could get utilities at the subject property.
10      24.   On or about May 27, 2008, Plaintiffs explained to Defendants Plaintiff RC's
11 disability-related need for water service at the subject property and discussed procedures for
12 getting utility service. They were given a checklist including utility construction submission
13 requirements that Defendants claimed were needed to submit before obtaining a quotation for
14 utilities.
15      25.   In late May, 2008, Plaintiffs submitted utility applications to Defendants and
16 called for blue-staking of utility lines.
17      26.   Thereafter, Defendants denied receiving utility applications from
18 Plaintiffs and never acted upon these applications.
19      27.   On October 24, 2008, Plaintiff RC wrote a letter to Defendants explaining his
20 disability-related need for immediate utility service, including a water connection.
21      28.   On or about December 8, 2008, having heard nothing on either their
22 applications for utilities or the October 24, 2008, letter, Plaintiffs submitted a second
23 application for utilites to Defendants.
24      29.   On December 8, 2008, Plaintiff Jinjer Cooke met with Jerry Barlow,
25 Defendant's agent, in the Utility Office of Defendant HCC Utilities, together with a
26 representative of Arizona DES Division of Developmental Services to discuss utility services
27 for Plaintiffs. At the meeting, Barlow denied receiving Plaintiffs' May utility applications
28
                                                5

1  and stated that Plaintiffs needed to complete new applications for utilities other than power,
2  complete a utility checklist, and have inspections before they could receive utility services
3  from Defendants. Barlow further advised that Plaintiffs could not have a water connection
4  because the system was over-extended and the Defendants has a policy of no new water
5  connections since July of 2007 when water emergencies had been declared, but told the
6  Plainitffs that they were still reconnecting existing water connections. Barlow told Plaintiffs
7  that the determination of who would receive water connections were based not on
8  engineering or health and safety, only on policy.

9      30.   On December 8, 2008, Defendants had no written policy prohibiting new
10  water connections since July, 2007.

11     31.   At all times relevant hereto, Defendants had a sufficient supply of water to
12  provide water services to the Plaintiffs at the subject property.

13     32.   On information and belief, at times relevant hereto, other residents of
14  Colorado City and Hildale have lived in unfinished homes without new building permits and
15  received utility services from Defendants.

16     33.   Since January, 2008, Defendants have provided water service connections to
17  more than 100 properties with existing connections. Based on records provided by
18  Defendants to the Civil Rights Division of the Arizona Attorney General's Office, there are
19  more than 80 other properties with existing water service connections for which Defendants
20  would be willing to provide water service connections, regardless of Defendants' alleged
21  water shortage.

22     34.   The subject property is within Defendants' municipal water service area.

23     35.   On or about December 15, 2009, Defendants responded to Plaintiffs' October
24  24, 2008, request for reasonable accommodation on behalf of all Defendants. In Defendants'
25  response, Defendants stated that Plaintiffs could not have a water service connection because
26  the water system was over-extended and only properties with pre-existing water connections
27  were being reconnected. As to other utilities, Defendants again denied having seen

28

Plaintiffs' May, 2008, utility applications and told Plaintiffs that they had to fill out more utility applications and have a utilities inspection before receiving utilities.

36. On or about December 23, 2008, RC filed a timely complaint of housing discrimination with the Arizona Civil Rights Division of the Arizona Attorney General's Office ("Division") pursuant to A.R.S. §41-1491.22(C), in which RC alleged that he had been the victim of disability and religious discrimination by Defendants.

37. During the investigation, Defendants acknowledged that they did not have a written policy or ordinance denying new water service connections to properties that did not have previous water service or allowing new water service only to properties that previously had water service.

38. The April 2007, Water Service Regulations of the Hildale-Colorado City Water Department which govern supply and utilization of water by Defendants were not amended to ban new water service connections.

39. On October 29, 2009, Utility Board President Jonathan Fischer stated under oath to the Division that the Utility Board could not add one new water connection for Plaintiffs because it would have jeopardized the system, but stated that Defendants would have added the connection for Plaintiffs if UEP had made assurance that no new families would be placed on homes not previously served by water.

40. On October 13, 2009, Plaintiffs paid utility hookup fees and deposits and a sewer impact fee to Defendants for the subject property, and attempted to reach Defendants to get a building permit.

41. On October 14, 2009, Defendants informed Plaintiffs that the Defendant Colorado City had already issued a building permit to Robert Black and, for that reason, would not issue a building permit to the Plaintiffs. Plaintiffs asked if they could have a utility inspection without a building permit, but received no response from Defendants.

42. The building permit issued to Robert Black in 2009 is dated October 13, 2009, and, unlike the 2001 building permit for the subject property, the 2009 building permit

bears no signature or acknowledgment of Black's right to occupy the property from UEP, as the property owner.

43. Upon information and belief, Defendant Colorado City has never closed a building permit in the past for "work in progress." Persons often live in unfinished homes in Colorado City for years during construction without getting new building permits. There are numerous occupied unfinished properties on UEP property in Colorado City. Despite the common practice of FLDS members living in unfinished homes for years, Defendants have not issued any new building permits from January 1, 2005, through October 1, 2009.

44. Although Defendant CC prefers to have a building permit before utility inspections, it is not a hard and fast rule. Defendant CC has conducted utility inspections before issuance of a building permit, regardless of their preference for a building permit first.

45. On or about December 28, 2009, the Utility Board held a public hearing to discuss an application by FLDS-owned and operated Twin City Improvement Association to use its canyon irrigation rights to obtain culinary water hookups for four triplexes being built in Hildale to provide 12 housing units for FLDS members outside of UEP land.

46. At the hearing, Defendants stated that a water engineer had been retained who studies Utah requirements and made water calculations. Defendants had determined that the Twin City Water Works had sufficient capacity to handle and treat additional irrigation water and convert it to sufficient culinary water for new FLDS housing developments.

47. During the hearing, Defendants' water engineer confirmed that Defendants had still not measured the aquifer or otherwise determined the amount of water actually available for culinary water service connections.

48. Defendants delayed Plaintiffs from obtaining electric services for the subject property for months by failing to act upon the Plaintiffs' May and December 2008 utility applications. They further delayed Plaintiffs from obtaining electrical service for the subject property by requiring standards for the Plaintiffs which it did not previously require for providing electricity for other Colorado City customers.

8

49. Finally, in 2010, Plaintiffs belatedly received electrical services and sewer services. To the date of the filing of this Complaint, Defendants have continued to refuse to provide Plaintiffs with water services.

50. Due to the delays in obtaining electrical service and sewer service, Plaintiffs have spent two winters and over two years in a cramped, cold travel trailer, relying on a propane fuel generator and no sewer service.

51. The failure of the Defendants to provide available and necessary culinary water to Plaintiffs has forced Plaintiffs to haul in culinary water on an every-other-day basis, which is particularly cumbersome due to Plaintiff RC's disabilities.

52. Throughout the residency of the Plaintiffs on the subject property, RC has needed running water to clean catheters, bathe frequently, avoid infection and wash laundry. He has required electricity to operate the medical device that assists him with breathing while he sleeps. The failure of the Defendants to provide essential city services has jeopardized Plaintiff RC's medical condition.

53. As a result of the actions of the Defendants aforementioned, Plaintiffs have suffered economic damages, severe emotional distress and loss of enjoyment.

54. On or about May 1, 2010, Robert Black ("Black") arrived at the subject property and claimed that the house thereon belonged to him. He demanded that the Plaintiffs evacuate immediately. Agents of the Colorado City Marshal's Office arrived and stated to Plaintiffs that Black had a building permit. He demanded that the Plaintiffs show him papers to prove that they had a legal right to be on the subject property.

55. Prior to May 1, 2010, Defendant CC already knew that the Plaintiffs had a right to occupy the subject property. Plaintiff Jinjer Cooke told Defendant CC that Black was trespassing, but was advised by Defendant CC that the CC City Attorney has instructed the Marshal's Office to only take a report.

56. By May 1, 2010, the October 13, 2009 building permit issued by Defendant CC to Black was more than 180 days old and Black had done on construction on the subject

9

property. Defendant CC did not cite Black for trespassing or for harassing the Plaintiffs, and did not advise him that his building permit had expired.

57. On or about May 3, 2010, FLDS spokesperson Willie Jessop and Defendant CC Building official Jake Barlow arrived outside the subject property with other men. Later that day, while the Plaintiffs' children were home alone, Black returned to the subject property with representatives of the Colorado City Marshal's Office and the Mohave County Sheriff's Department. Black again claimed to own the house and neighbors came to stay with the Plaintiffs' children until the parents returned home that evening.

58. On or about June 2, 2010, Scott Jessop, upon information and belief an employee for an irrigation company connected to FDLS spokesperson Willie Jessop, arrived at the subject property and stated that he was checking for theft of services. Jessop returned to the subject property a few hours later with a member of the Colorado City Marshal's Office, a backhoe and other men. Agents of Defendant CC told Seth Cooke, Plaintiff RC's brother, that they were going to dig up the front yard of the subject property to check for theft of service of irrigation water.

59. Plaintiffs, having to haul water personally for over two years, had not used any irrigation water from the line that ran across the subject property. Nevertheless, Deputy Barlow arrested Plaintiff RC's brother for obstruction and theft of services, put him in handcuffs and placed him in the patrol car. Seth Cooke was arrested, despite being told by UEP representative Jethro Barlow, who arrived on the scene, that UEP claimed the rights to the irrigation water in the pipes on the subject property, and that Seth Cooke had not illegally procured water from UEP.

60. Plaintiff Jinjer Cooke was assaulted by Scott Jessop in the presence of members of the Colorado City Marshal's Office. Plaintiff Jinjer Cooke requested that Jessop be cited for assaulting her, but the Marshal's Office refused to do so.

61. The acts of the Defendant aforementioned constitutes a continuing violation of the Constitutional and statutory rights of the Plaintiffs.

62. On April 5, 2010, the Division issued a reasonable cause determination, finding that reasonable cause existed to believe that these Defendants violated the Arizona Fair Housing Act by discriminating against the Plaintiffs based on disability and religion, and by engaging a pattern and practice of discrimination based on religion.

63. As a proximate result of Defendants' actions described above, Plaintiffs have suffered, and are continuing to suffer injuries, including, but not limited to, deprivation of their Constitutional and statutory rights, economic loss, lack of necessary facilities to properly sustain life, humiliation, embarrassment and emotional distress.

## CAUSES OF ACTION

### COUNT ONE

**(Unlawful Discrimination under 42 U.S.C. § 1981)**

64. Plaintiffs reallege and incorporate by reference paragraphs 1-63 above as though fully set forth herein.

65. By the actions described above, Defendants have continually denied Plaintiffs the rights to essential utility services as are enjoyed by members of the FLDS religion and by persons who are not disabled, in violation of 42 U.S.C. § 1981.

66. By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern and practice of discrimination against non-FLDS affiliated persons based on religion in violation of 42 U.S.C. § 1981.

67. Defendants have acted intentionally, knowingly, and continuously engaged in the practices described above with the intent of denying equal housing opportunities to Plaintiffs.

### COUNT TWO

**(Unlawful Discrimination Under 42 U.S.C. § 1982)**

68. Plaintiffs reallege and incorporate by reference paragraphs 1-67 above as though fully set forth herein.

69. By the actions described above, Defendants have continually denied

Plaintiffs the same right to hold property as enjoyed by FLDS member citizens of the United States, in violation of 42 U.S.C. § 1982.

70. By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern and practice of discrimination against non-FLDS members due to Plaintiffs' personal religious beliefs, in violation of 42 U.S.C. § 1982.

71. Defendants have intentionally, knowingly and continuously engaged in the practices described above, with the intent of denying equal housing opportunities to the Plaintiffs.

## COUNT THREE
### (Unlawful Discrimination under 42 U.S.C. § 1983)

72. Plaintiffs reallege and incorporate by reference paragraphs 1-71 above as though fully set forth herein.

73. The above conduct of the Defendants have been taken under color of state and local law.

74. By the actions described above, Defendants have deprived, and continue to deprive, Plaintiffs of the rights, privileges, and immunities secured by the United States Constitution and other laws.

75. By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern and practice of discrimination against non-FLDS affiliated residents of Colorado City, including, Plaintiffs, due to Plaintiffs' lack of religious affiliation with FLDS and because of RC's disabilities, in violation of 42 U.S.C. § 1983.

76. Defendants have intentionally, knowingly and continuously engaged in the practices described above, with the intent of denying equal housing opportunities to Plaintiffs.

## COUNT FOUR
### (Unlawful Discrimination under the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*)

77. Plaintiffs reallege and incorporate by reference paragraphs 1-76 above

as though fully set forth herein.

78. By the actions described above, Defendants have violated, and/or continue to violate, the rights of Plaintiffs under the Federal Fair Housing Act, 42 U.S.C. § 3601, *et seq.* by making unavailable dwellings to person because of religion, in violation of 42 U.S.C. § 3604(a) and by discriminating on the basis of religion in the terms, conditions or privileges of the provision of services or facilities in connection with the sale or rental of a dwelling, in violation of 42 U.S.C. § 3604(b) and the implementing regulations.

79. Defendants have intentionally, knowingly and continuously engaged in the practices described above, with the intent of denying equal housing opportunities to Plaintiffs.

**COUNT FIVE**

**(Discrimination in Violation of A.R.S. § 41-1491 of AFHA)**

80. Plaintiffs reallege and incorporate by reference paragraphs 1-79 above as though fully set forth herein.

81. The subject project is a dwelling within the meaning of A.R.S. § 41-1491(7)(a) of AFHA.

82. RC Is a person with a disability pursuant to A.R.S. § 41-1491(5).

83. RC's letter dated October 24, 2008, constituted a disability-related request to Defendants for a reasonable accommodation in Defendants' rules, policies, practices, and services so that RC could receive immediate utility service at the subject property.

84. RC's requested reasonable accommodation was necessary to afford RC an equal opportunity to use and enjoy a dwelling in Colorado City, and did not pose an undue burden for Defendants.

85. By letter dated December 15, 2008, then City of Hildale Business Manager Jerry Barlow, on behalf of all Defendants, refused to grant RC's request for reasonable accommodation.

86. Under A.R.S. § 41-1491.19(E)(2), it is discriminatory to refuse to make

reasonable accommodations in rules, policies, practices or services if the accommodations may be necessary to afford a disabled person equal opportunity to use and enjoy a dwelling.

87. As a result of discrimination by Defendants, RC suffered physical pain, emotional distress, inconvenience, embarrassment, humiliation, denied of civil rights and monetary damages in an amount to be determined at trial.

## COUNT SIX
### (Discrimination in Violation of A.R.S. § 41-1491.14(B) of AFHA)

88. Plaintiffs reallege and incorporate by reference paragraphs 1-87 above as though fully set forth herein.

89. Defendants discriminated against RC in providing services or facilities in connection with the rental of a dwelling because of a religion, in violation of A.R.S. § 41-1491.14(B) of the AFHA.

90. As a result of Defendants' discrimination, Plaintiffs suffered physical pain, emotional distress, inconvenience, embarrassment, humiliation, denial of civil rights and monetary damages in an amount to be determined at trial.

## COUNT SEVEN
### (Discrimination in Violation of A.R.S. § 41-1491.14(A) of AFHA).

91. Plaintiffs reallege and incorporate by reference paragraphs 1-90 above as though fully set forth herein.

92. As a result of the Defendants' discriminatory failure and refusal to provide water and other utilities services to the Plaintiffs at the subject property, Defendants made housing in the home at the subject property unavailable to the Plaintiffs in violation of A.R.S. § 41-1491(A), and the Plaintiffs suffered physical pain, emotional distress, inconvenience, embarrassment, humiliation, denial of civil rights and monetary damages in an amount to be determined at trial.

## COUNT EIGHT
### (Interference in Violation of A.R.S. § 41-1491.18 of AFHA)

93.     Plaintiffs reallege and incorporate by reference paragraphs 1-86 above as though fully set forth herein.

94.     Defendants interfered with the Plaintiffs' exercise and enjoyment of rights to have the equal opportunity to use and enjoy a dwelling without disability discrimination.

95.     Defendants interfered with Plaintiffs' rights to enjoy the subject property without discrimination based on religion.

WHEREFORE, Plaintiffs request that this Court:

(1)     enter judgment on behalf of Plaintiffs, finding that Defendants violated the Constitutional and statutory rights of the Plaintiffs as aforementioned;

(2)     order that Defendants provide immediate water service to Plaintiffs at the subject property;

(3)     award Plaintiffs compensatory damages for monetary losses, pain and suffering, humiliation and loss of enjoyment of the subject property;

(4)     award Plaintiffs their reasonable attorney's fees and costs, pursuant to 42 U.S.C. §§ 1988 and 36.13(c)(2), and A.R.S. § 41-1491.35; and,

(5)     grant such other and further relief as the Court may deem just and proper under the circumstances.

DATED this 24th day of June, 2010.

WILLIAM G. WALKER P.C.


s/William G. Walker

William G. Walker
Attorney for Plaintiffs

15